**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: Executive Development Associates, Inc. d/b/a EDA, Inc. | Case No. 26-40233 |
| Debtor and Debtor-in-Possession | Chapter 11 (Voluntary), Subchapter V |

# SMALL BUSINESS DEBTOR'S SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION DATED AUGUST 3, 2026

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JUNE 18, 2026**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY JUNE 18, 2026.. THE BALLOT MUST BE MAILED OR EMAILED TO THE FOLLOWING ADDRESS:**

Ryan A. Blay

WM Law

15095 W. 116th St.

Olathe, KS 66062

blay@wagonergroup.com

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR [DATE TO BE ANNOUNCED] AT THE U.S. BANKRUPTCY COURT, WESTERN DISTRICT OF MISSOURI, 400 E. 9th St., Kansas City, MO 64106,**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

Dated: August 3, 2026

/s/ Ryan A. Blay

WM Law
15095 W. 116th St.
Olathe, KS 66062
blay@wagonergroup.com

# SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

This Plan provides for the reorganization of Executive Development Associates, Inc. ("EDA" or the "Debtor") under Subchapter V of Chapter 11 of the Bankruptcy Code. The Debtor will continue operating its human capital technology and consulting services business and will fund Plan payments from continuing operations over a five (5) year term commencing on the Effective Date.

The Plan provides for the following treatment of claims and equity interests:

| Class | Description | Treatment Summary |
|---|---|---|
| — | Administrative Expenses (§ 2.1(A)) | Paid in accordance with § 2.1(A). Estimated total $15,000+, primarily counsel and the Subchapter V Trustee; paid from trust funds and monthly installments. |
| — | Priority Tax Claim — IRS (§ 2.1(B)) | The Debtor has filed an objection to the IRS proof of claim #11 and anticipates no amounts will be due upon the resolution of the claim objection.<br><br>The claim shows an estimated amount owed of $420,898.94 (unassessed; based on estimated returns). Any actual assessed and surviving claim shall paid with 7.0% present-value interest over five years. Subject to Offer in Compromise after returns are finalized. |
| Class 1 | Secured — U.S. Small Business Administration | Allowed Secured Claim of $280,000 (the value of the collateral under § 506(a)), paid with 7% interest.. Deficiency, if any, reclassified to Class 5. |
| Class 2 | Smart Business (purported secured, Claim #4) | Junior lien stripped under § 506(a) (no collateral value remaining). Claim reclassified to Class 5 General Unsecured. |
| Class 3 | Academy Bank (Claim #6) | Junior lien stripped under § 506(a) (no collateral value remaining). Claim reclassified to Class 5 General Unsecured. |
| Class 4 | Priority Wage — Liv D'Aquino (§ 507(a)(4)) | Paid in full ($5,930.38) as part of the missed-payroll catch-up in August 2026. |
| Class 5 | General Unsecured Claims | Pro-rata distribution of disposable income |

| | | |
|---|---|---|
| | | above secured and priority obligations over the 60-month Plan term, plus an annual True-Up of excess disposable income. |
| Class 6 | Equity Interests (Class A Common, SAFEs, and Reg CF) | All equity holders retain their respective interests; unimpaired. See Exhibit G. |

The Plan is funded entirely from the continuing operations of the Reorganized Debtor, with payments based on 10% of gross revenue, monthly, as collected.

The Debtor commits all projected disposable income for the five-year Plan term to creditors under the Plan, consistent with § 1191(c)(2). Confirmation is anticipated under § 1191(b) (non-consensual confirmation) if any impaired class does not accept the Plan.

# ARTICLE 1

## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1 Nature of the Debtor's Business.

Executive Development Associates, Inc., doing business as EDA, Inc. ("EDA" or the "Debtor"), is a premium human capital technology and services company founded in 1982 and headquartered in Lee's Summit, Missouri, with a satellite presence in Oklahoma City, Oklahoma. The Debtor has operated as a 100% virtual organization since 2008, with two W-2 employees, two contract developers in India, and a network of long-term contract consultants who can be engaged as client work requires. The Debtor serves Fortune 1000 enterprises, large private companies, and U.S. government clients through two complementary lines of business:

- **Technology Division.** Proprietary AI-enabled SaaS platforms for organizational culture, engagement, and assessment, marketed under the CultureTech HQ™ umbrella, including: (i) Culture 20/20® (formerly CultureVue™) — a real-time AI-driven culture dashboard that eliminates the need for traditional culture and engagement surveys, the first commercially available platform of its kind; (ii) SurveyStreams™ — a one-stop enterprise-wide survey platform with a specialty in HR/Leadership Development and 360-degree assessments; and (iii) a proprietary in-house email engine supporting marketing operations against the Debtor's 800,000-contact enterprise database. Technology revenue is predominantly recurring subscription revenue under multi-year contracts.
- **Services Division.** Premium executive development services including C-Suite and Executive Coaching, Board Education and Evaluations, Succession Planning, Custom Executive Development, packaged High-Potential Development Programs, and Assessment and Selection Services. Proprietary programs include Leadership Effectiveness Survey® III, Paragon7® (Cognitive Readiness for Senior Leaders), Critical Thinking Boot Camp®, Leading with Vision™, Strategic Executive Development Workshop™, Rapid-Cycle Diagnostic and Design®, and Coach the Coach. The CEO has personally delivered more than 250 C-suite coaching engagements and 300+ executive presentations.

The Debtor's representative client list includes Aramark Services, AT&T, Boeing, Chesapeake Energy, Chevron, Cisco, Colgate, Credit Suisse, Dell, Devon Energy, Dow Chemical, Duke University, Goldman Sachs, Honeywell, IBM, Johnson and Johnson, LinkedIn Learning, Lockheed Martin, MassMutual, McKesson, Merrill Lynch, Motorola, NCR, RAND Corporation, Saudi Aramco, Sun Microsystems, Synopsys, Texas Instruments, UBS, Unilever, and Weyerhauser, among others. Government and government-contractor engagements have included the U.S. Department of Defense, U.S. Department of Energy, U.S. Department of

Veterans Affairs (Veterans Affairs Acquisition Academy – a $2M+ contract), U.S. Department of the Interior, U.S. Air Force (SBIR Phase I), U.S. Strategic Command, National Security Administration, Honeywell Kansas City National Security Campus (National Nuclear Security Administration), Defense Ammunition Center ($1M+ contract), Federal Aviation Administration, Federal Reserve Bank of Richmond, Washington Metropolitan Area Transit Authority, and L3 Harris.

The Debtor holds the following credentials, certifications, and assets: certified Women-Owned Small Business and Women-Owned Business status; Unique Entity Identifier CBRCMYLVJYN7; CAGE Code 4ZXQ9; DUNS 808431147; EIN 20-8359176; an active U.S. Department of Energy L Clearance held by the CEO, and a TS-SCI clearance held by Retired Brigadier General David Komar (inactive); registered trademarks including CultureVue™, SurveyStreams™, Culture 20/20®, Leadership Effectiveness Survey® III, Paragon7®, Critical Thinking Boot Camp®, CultureTech HQ™, Return-on-Investment Assessment®, Rapid-Cycle Diagnostic and Design®, Leading with Vision™, and Think Red®; the Top 10 Companies in Executive Development Award; the verified 800,000-contact enterprise database; and three published books authored by the CEO (Decades of Differences, Leading with Vision, The Courage to Advance). The Debtor's strategic revenue model is transitioning toward a 70% technology / 30% services mix as the technology subscription base scales.

**1.2 History of Business Operations of the Debtor.**

Executive Development Associates, Inc. was founded in 1982. Its assets were acquired by current management on January 16, 2007, and CEO Bonnie K. Timms (f/k/a Bonnie K. Hagemann) has led the Company since that acquisition. The Debtor has operated continuously for forty-four (44) years as a recognized leader in executive development and human capital services. Through its 43-year history, the Debtor has been the originator of multiple industry firsts, including: the first to tie executive development directly to organizational strategy; the first to publish what has become the leading benchmarking research in the industry ("Trends in Executive Development," published continuously since 1983); the first vertical in critical thinking development for senior leaders; the first vertical in visionary leadership; and the first commercially-available AI-driven real-time culture dashboard.

The CEO is a recognized industry thought leader and a LinkedIn Learning C-suite instructor. She has authored three books, hosts the "Real Life, Real Leaders" podcast, and has delivered hundreds of keynote presentations to enterprise audiences. The Debtor has been 100% virtual since 2008. Over the past decade, the Debtor has invested its services profits into the development of its proprietary technology platforms, positioning the Company for the strategic transition from a services-dominant model to a technology-led business. The Debtor's vision is to

create and dominate the AI-driven real-time culture management category, providing leaders and boards with governance-level visibility into culture, engagement, and cultural risk.

As of the Petition Date, the Debtor maintains approximately $119,000 in current accounts receivable, approximately $400,000 in projected services revenue for 2026 (reduced from prior estimates following the termination of the Scott Dannemiller / LifeWork Associates consulting arrangement described in § 1.8 and the resulting departure of associated contract consultants), and technology subscription contracts extending three years forward.

**1.3 Filing of the Debtor's Chapter 11 Case.**

On February 11, 2026, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, electing treatment under Subchapter V. The Chapter 11 case is pending in the United States Bankruptcy Court for the Western District of Missouri.

**1.4 Legal Structure and Ownership.**

The Debtor is a Missouri corporation. The Debtor’s equity interests, including Class A Common Stock and unconverted Simple Agreements for Future Equity (SAFEs), are held by a group of long-term investors and employees. A complete capitalization table is attached as Exhibit G. The Debtor’s Chief Executive Officer, Bonnie K. Timms (f/k/a Bonnie K. Hagemann), is the largest single equity holder.

**1.5 Debtor's Assets.**

The Debtor's Assets, as scheduled in Schedule A/B, are attached as **Exhibit A** to this Plan. The Debtor's tangible and intangible personal property is subject to a first-priority blanket lien held by the United States Small Business Administration ("SBA") pursuant to UCC Financing Statement No. 20240710000834482 (recorded with the Missouri Secretary of State on July 10, 2024), with junior liens asserted by Smart Business and Academy Bank. The value of the collateral, determined as a going concern for the purposes of 11 U.S.C. § 506(a), is $280,000 pursuant to a recent valuation of the business.

**1.6 Debtor's Liabilities.**

The Debtor's liabilities, as scheduled in Schedules D and E/F, are attached as **Exhibit B** to this Plan. There may be liabilities that were inadvertently not scheduled, that were scheduled under a different name, or that were scheduled in a different amount than the actual obligation.

**1.7 Current and Historical Financial Conditions.**

The Debtor's historical financial condition is reflected in its tax returns for 2023 through 2025, available on request, and in the monthly operating reports filed in this case for February and

March 2026. The Debtor's projected financial condition over the Plan term is reflected in the Debtor's Monthly Budget and Projections (March 2026 – February 2031), attached as **Exhibit C,** which supports the feasibility of the Plan. April's Monthly Operating Report is due after this Plan is to be submitted but will be available for Parties in Interest to review in considering whether to support confirmation of the Plan.

**1.8 Events Leading to the Filing of the Bankruptcy Case.**

The Debtor's Chapter 11 filing on February 11, 2026 was the result of a cascade of events in 2025 and early 2026, most of which were outside the Debtor's control. Before describing the events, the Debtor notes for context that the CEO has been running companies since 2001 and the Debtor was 100% debt-free as of one month before the COVID-19 pandemic. The Debtor began 2025 as one of its most promising years, with more than $1,000,000 under contract by the end of January 2025. The events that follow caused a cascading set of challenges:

1. **Tariff-Driven Revenue Disruption.** Federal tariff actions in 2025 caused an approximately five-month near-cessation of new enterprise contract signings as clients held commitments awaiting resolution of economic uncertainty. This was an indirect impact on the Debtor: client procurement decisions were paused, not cancelled, but the cumulative impact on cash flow was severe.
2. **Blocked Strategic Sale (SBA Constraints).** The Debtor pursued a sale of its services division in 2025 to generate liquidity, focus on its technology platform, and maintain operations. The SBA required that 100% of sale proceeds be applied to its debt, which would have rendered the business unable to continue operating, effectively foreclosing the transaction.
3. **Consultant Breach and Intellectual Property Misappropriation.** When the strategic sale did not close, the Debtor was unable to make timely payment to a long-term contract consultant, Scott Dannemiller, in 2025. Under financial pressure, the Debtor agreed to shift the services back-office function to Mr. Dannemiller's company, LifeWork Associates, with payments to flow through LifeWork and EDA's revenue share to be remitted to EDA. Within weeks of signing that agreement, the Debtor discovered evidence (including emails from 2024) that Mr. Dannemiller had been diverting EDA clients to LifeWork — both before and after the contract was signed — using EDA's proprietary intellectual property, EDA proposal templates (rebranded with LifeWork's logo), EDA content, and EDA contract consultants. The Debtor attempted to negotiate a quiet separation. The consultant refused to accept responsibility. In November 2025, the Debtor terminated the relationship to take back control of its cash flow.
4. **Aggressive Creditor Conduct (Epic Advance LLC).** Concurrently, one of the Debtor's lenders, Epic Advance LLC (a merchant cash advance provider), began sending payment-redirection and lien notices directly to the Debtor's clients — including notices addressed

to client Chief Executive Officers, General Counsel, and HR leadership — directing them to remit payments to Epic instead of EDA. This conduct created client confusion and caused multiple long-standing clients to hold all payments, including RAND Corporation (a client since 2017), Sound Transit (a client since 2019), Centers for Independence (a client since early 2025), and others. Epic Advance also sent lien notices to entities with which the Debtor had no contract — a fact pattern suggesting that Epic Advance may have improperly accessed the Debtor's communications. Some of these notices were dated the day before the Chapter 11 filing but were sent to clients more than a month after the filing.

5. **Compounding Effect of Diversion and Lien Notices.** Scott Dannemiller and LifeWork Associates received one of Epic Advance's notices and used it as a basis to stop remitting EDA's revenue share from clients who were still paying. This meant that LifeWork was receiving payment on behalf of EDA and retaining EDA's revenue share. Two long-term clients came through with paid-in-advance work that prevented an abrupt cessation of business — one for $175,000 and one for $54,000. The combined effect of the Dannemiller diversion and the Epic Advance lien-notice campaign was an almost complete stoppage of incoming cash flow.

6. **Cyber Fraud Event.** The latter of the two paid-in-advance payments was diverted in a cyber incident: a threat actor intercepted an email thread between the Debtor and the client and redirected the $54,000 payment to a fraudulent account. The client re-issued payment in full; the Debtor engaged a cybercrime specialist and recovered $34,000, but incurred significant additional expense and time during an already-strained period.

7. **Hard-Money Lender Pressure.** During this period the Debtor faced relentless collection conduct from hard-money lenders, including 50 to 100 phone calls and text messages per day, becoming a substantial daily distraction from operations. The CEO informed each creditor in October 2025 that the Debtor was behind and worked to keep all of them informed at all times throughout the cash-flow disruption.

8. **Good-Faith Renegotiation with All Creditors.** From November 2025 through early February 2026, the Debtor's CEO personally negotiated with each creditor one by one. The Debtor obtained written agreements with every creditor except Epic Advance. With Epic Advance, every time the Debtor believed it had reached an agreement, Epic raised the proposed numbers or sent contracts that did not reflect what had been agreed; ultimately Epic refused to remove an unrelated third party (Kristi Overton Johnson Ministries) from the loan documents — a non-negotiable demand by the Debtor — and continued sending lien notices to clients in parallel.

9. **Filing of Chapter 11.** The combined effect of the client-payment diversion by Dannemiller/LifeWork and the lien-notice campaign by Epic Advance left the Debtor without the cash flow needed to pay employees or vendors, despite having receivables to

support those obligations. The CEO filed Chapter 11 Subchapter V on February 11, 2026 to restore cash flow recovery through the Court's process. The CEO personally filed Chapter 7 on the same date, having invested all of her personal resources into the Debtor.

10. **Loan Defaults.** The cash flow disruption caused defaults with several lenders. The Debtor successfully renegotiated all defaults except Epic Advance, whose aggressive collection conduct continued through the date of filing.

Steps the Debtor has taken to cure these problems and stabilize operations:

- Terminated the Dannemiller/LifeWork consulting arrangement and is pursuing recovery of misdirected client payments;
- Obtained court approval for an Emergency Cash Collateral Order and filed motions for turnover against Sound Transit, Plastek, and others to recover diverted client funds;
- Transitioned to a lean operating model with only the CEO and CTO remaining on payroll; all other roles are 1099 contractors or have been terminated;
- Eliminated all non-essential overhead, including CEO health insurance;
- CEO has deferred compensation through June 2026 and will operate at substantially reduced compensation through 2026 (see § 2.7);
- Continued technology development and SOC 2 compliance progression, with the CTO leveraging AI-augmented productivity to materially expand technical output without expanding headcount;
- Secured contracted services revenue through August 2026 (projected at approximately $400,000 for full-year 2026, reduced from prior estimates following the Dannemiller / LifeWork termination), technology subscription contracts extending three years forward, and continued client wins post-petition (including two new culture-dashboard clients secured by the technology team, demonstrating that the technology can be sold independent of CEO relationships);
- Improved the SurveyStreams™ platform for current clients with white-labeling, client-specific security capabilities, and a support mechanism for collaborative client work — creating an easy upsell path for increased monthly recurring revenue;
- Secured the CultureTech HQ™ trademark and prepared for the operational separation of the technology and services lines under that umbrella.

**1.8(a) Strategic Path Forward.**

The Debtor's strategy to emerge from Chapter 11 and operate profitably is the continued execution of its technology-led transition. Specifically:

11. **Technology becomes the dominant revenue stream.** The Debtor's strategic priority is to grow its technology subscription base through Culture 20/20® and SurveyStreams™

to deliver recurring revenue at a scale that supports the business with reduced dependence on services revenue or CEO-originated direct sales. The Debtor's operating budget (Exhibit C) reflects 20% monthly compounding tech subscription growth from a $600/month base in July 2026 through the Plan term — a projection supported by the $4.78 million gross sales pipeline ($462,977 probability-weighted) as of May 2026.

12. **Services becomes a complementary, higher-margin contribution.** Services revenue will continue from contracted clients and through the CEO's historical direct-sales contribution of approximately $400,000 per year, but services is no longer the primary engine. The strategic mix targets 70% technology / 30% services over the Plan term.
13. **Lean operating structure preserved.** The Reorganized Debtor will continue to operate with two W-2 employees (CEO and CTO) supplemented by 1099 contract consultants and the Debtor's two India-based contract developers. Headcount expansion will be contingent on revenue growth and AI-augmented productivity will be leveraged wherever possible to expand capacity without expanding overhead.
14. **Emerge with a reasonable debt load.** The Plan is structured so that, at completion, the only surviving debt is the balance of the SBA's $400,000 secured note (amortized over an extended period beyond the Plan term to maintain manageable monthly payments). All general unsecured debt is discharged. The IRS priority tax claim is paid in full (or reduced through Offer in Compromise) over the five-year Plan term. The Debtor will emerge as a viable, lower-debt operating business positioned for continued growth.
15. **Sales of assets**. The Debtor shall seek through this Plan the authority to sell its physical or intangible assets with net proceeds applied to the plan payout.. The Debtor will need authority to sell individual assets as it makes sense to do so. This is in the best interest of the SBA (and other creditors) as Verified Metrics assigns the Company's intangibles a 3.25% liquidation recovery factor — roughly $50,628 against a book balance of $1,557,792. That is what these assets are worth to a creditor if the Debtor ceases operating. Any sale made while operating the Debtor through the Plan realizes more than the liquidation factor. leaves the SBA better off than the alternative.

**1.9 Significant Events During the Bankruptcy Case.**

Significant events during the Debtor's Chapter 11 case include:

- Court approval of counsel (WM Law, Ryan A. Blay) under § 327;
- Appointment of G. Matthew Barberich, Jr. as Subchapter V Trustee under § 1183(a);
- Approval of an Emergency Order Authorizing Use of Cash Collateral;
- Motions for Turnover filed against Stripe (later withdrawn), Sound Transit, and Plastek to recover funds owed by customers and alleged to have been improperly directed to Epic Advance or other Merchant Cash Advance creditors;

- Filing of the Declaration of Bonnie Kay Timms in Support of Debtor's Use of Cash Collateral and Payment of Past Due Payroll;
- The Subchapter V Status Conference;
- Filing of monthly operating reports for the partial month of February 2026 and the months of March-June 2026;
- Negotiation and execution of a written agreement with terminated employee Liv D'Aquino dated May 8, 2026 resolving the amended amount of her § 507(a)(4) priority wage claim.
- A valuation of the business conducted by Verified Metrics

**1.10 Projected Recovery of Avoidable Transfers.**

The Debtor reserves all rights and causes of action arising under §§ 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and applicable state law, including without limitation potential claims for the recovery of payments diverted by Scott Dannemiller and LifeWork Associates and claims arising from the conduct of Epic Advance LLC. The Debtor has not completed its investigation of prepetition transfers. The Debtor anticipates completing such investigation within 180 days of the Effective Date and reserves the right to pursue avoidance actions thereafter. Confirmation of the Plan shall not constitute a release of any such claims.

# ARTICLE 2

## THE PLAN

The Debtor's Plan must describe how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purposes of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest may be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. A class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan. If any impaired class does not accept the Plan, the Debtor will seek confirmation under § 1191(b) (non-consensual confirmation).

### 2.1 Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Code. Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan, although they may object if their treatment under the Plan does not comply with what is required by the Code. The Plan does not place the following Claims in any class:

#### A. Administrative Expenses.

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount. Any undisputed Administrative Expense that is due and owing on the Confirmation Date must be paid in accordance with this Plan, upon such terms as agreed by the Debtor and the Administrative Claimant, or by court order. Disputed Administrative Expenses will be paid after they are allowed by the Bankruptcy Court.

Types of Administrative Expenses include:

16. Ordinary trade debt incurred by the Debtor after the Petition Date, paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors;
17. The value of goods purchased in the ordinary course of business within 20 days before the Petition Date;
18. Post-petition fees and expenses allowed to professionals, including the Subchapter V Trustee and attorneys/accountants employed with Bankruptcy Court authority, noticed to Creditors and approved by the Bankruptcy Court.

The following chart lists the Debtor's estimated Administrative Expenses and their proposed treatment under the Plan:

| **Type** | **Estimated Amount** | **Proposed Treatment** |
|---|---|---|
| Ordinary-course post-petition expenses | Variable | Paid in the ordinary course of business as incurred |
| Administrative Tax Claim (post-petition payroll taxes) | TBD as incurred | Remitted to taxing authorities concurrent with each payroll run |
| Value of goods received in the 20 days before the Petition Date | De minimis / none | N/A |
| Professional fees (WM Law) | $12,000 (estimated) | After Bankruptcy Court approval: Debtor applies all available funds in trust to outstanding balance; thereafter $500 per month for up to 24 months until the approved balance is paid in full. Debtor's counsel has received court approval for an award of $28,640 and fees of $62.98 on July 28, 2026, effectively liquidating the funds on hand in trust. |
| Clerk's Office fees | Statutory | Paid in full on the Effective Date |
| Subchapter V Trustee (G. Matthew Barberich, Jr.) | $3,000 (estimated) | Upon application under § 330 and Bankruptcy Court approval: paid directly by Debtor in full within 30 days of Court approval, unless otherwise expressly agreed by the Subchapter V Trustee |
| TOTAL (estimated, | $15,000+ | |

| | | |
|---|---|---|
| excluding ordinary course) | | |

**B. Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder agrees otherwise, each holder of a § 507(a)(8) Priority Tax Claim must receive the present value of such Claim in regular installments paid over a period not exceeding five (5) years from the order of relief. Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Taxing Authority / Type of Tax | Estimated Amount | Date of Assessment | Treatment |
|---|---|---|---|
| Missouri Department of Revenue | $0 | No claim scheduled, no assessed obligations | No payment through the Plan |
| Internal Revenue Service — WT-FICA, FUTA, Corporate Income | $420,898.94 (estimated, based on estimated returns and reports due 6/30/2022 – 3/31/2026)<br><br>The Debtor has filed a claim objection and believes the claim objection will resolve all estimated amounts asserted in the claim. | None of this tax has formally been assessed; the Debtor is preparing actual returns and the final allowed claim may differ materially | Payment Interval: Monthly<br>Begin Date: First day of the first full month after the Effective Date<br>End Date: On or before February 11, 2031 (five years from order of relief)<br>Interest Rate: 7.0% per annum<br>Monthly Payment: $0<br><br>Reservation: The Debtor reserves the right to pursue resolution with the IRS, including an Offer in Compromise after actual returns are finalized. Any reduction of the allowed IRS claim shall reduce alleged required payments accordingly. |

**2.2 Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan and the proposed treatment under the Plan:

**A. Classes of Secured Claims.**

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate to the extent allowed as secured Claims under § 506 of the Code. If the value of the collateral securing a Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency is classified as a general unsecured Claim. The Debtor has determined the value of the collateral securing the SBA's first-priority blanket lien is $400,000 as a going concern. As a result, the secured claims junior to the SBA's lien (Smart Business and Academy Bank) have no collateral value to which they may attach and are stripped under § 506(a).

The following chart sets forth the treatment of each class of secured prepetition claims under the Plan:

**Class 1 — United States Small Business Administration (SBA)**

| Field | Value |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Status | No Proof of Claim filed as of the date of this Plan |
| Collateral Description | First Perfected Security Interest in the following personal property of the Debtor, based on a properly perfected security interest recorded with the Missouri Secretary of State on July 10, 2024 (UCC Financing Statement No. 20240710000834482): all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes, (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software, and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof, and all records and data relating thereto. Includes certain Patents and registered Trademarks. |

| | |
|---|---|
| Allowed Secured Amount | $280,000 — based on a valuation by Verified Metrics as of May 31, 2026 of the fair market value of the collateral as a going concern under 11 U.S.C. § 506(a). The going-concern value reflects (a) recurring revenue from existing technology subscription contracts, (b) contracted services revenue through August 2026, (c) the substantial active sales pipeline, and (d) the continued personal involvement of the Debtor's CEO, who originates substantially all of the Debtor's direct services sales and manages client relationships. Without the continued involvement of existing management, the value of the collateral would decline materially toward liquidation value (approximately $204,000; see Exhibit F). If the SBA objects to the going-concern valuation, the Debtor will request that the Court determine the value of the collateral. The Debtor also reserves the right to file a separate Motion for Determination of Value of Collateral pursuant to Federal Rule of Bankruptcy Procedure 3012 to resolve the valuation in advance of confirmation. |
| Principal owed (per SBA loan documents) | Unknown |
| Pre-petition arrearage | Unknown |
| Total Claim | Unknown, stated as $1,685,910 on Debtor’s schedules |
| Deficiency | Any portion of the SBA's total claim in excess of $400,000 shall be treated as a Class 5 General Unsecured Claim |
| Monthly Payment | Pro-rata share of the monthly Plan payment of 10% of gross monthly revenues, structured to apply present-value interest |
| Payments Begin | October 1, 2026. |
| Payments End | September 1, 2031 or when the secured claim is paid in full, whichever is earlier. |
| Balloon Payment | None |
| Interest Rate | 7% per annum, or such other rate as the Court determines provides present value, consistent with *Till v. SCS Credit Corp*., 541 U.S. 465 (2004) |
| Treatment of Lien | The SBA shall retain its lien on the collateral until the Allowed Secured Amount is paid in full, consistent with § 1129(b)(2)(A)(i)(I). This claim is not being treated under § 1190(3). |

| | |
|---|---|
| Additional payment required to cure defaults | None — Allowed Secured Amount established by § 506(a) determination is the full secured obligation under the Plan |
| Confirmation Basis | If the SBA does not accept the Plan, confirmation is sought under § 1191(b), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to this Class |

**Class 2 — Smart Business (Claim #4 — Purported Secured, Stripped Under § 506(a))**

| Field | Value |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Status of Lien | The Debtor disputes that Smart Business holds a perfected, validly-recorded security interest in the Debtor's property. To the extent any such security interest exists, it is junior to the SBA's first-priority blanket lien. |
| Treatment | Because the value of the collateral ($400,000) is fully consumed by the SBA's first-priority secured claim, no collateral value remains to which Smart Business's claim can attach. Under 11 U.S.C. § 506(a), Smart Business's claim is therefore stripped of any secured status and is reclassified as a Class 5 General Unsecured Claim. |
| Allowed Secured Amount | $0 |
| Allowed Unsecured Amount | Such amount as may be allowed under § 502, treated under Class 5 |
| Confirmation Basis | If Class 2 does not accept the Plan, confirmation is sought under § 1191(b) |

**Class 2 — Credibly of Arizona LLC (Claim #12 — Purported Secured, Stripped Under § 506(a))**

| Field | Value |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Status of Lien | The Debtor disputes that Credibly of Arizona LLC holds a perfected, validly-recorded security interest in the Debtor's property. To the extent any such security interest exists, it is |

| | |
|---|---|
| | junior to the SBA's first-priority blanket lien. |
| Treatment | Because the value of the collateral ($400,000) is fully consumed by the SBA's first-priority secured claim, no collateral value remains to which Credibly of Arizona LLC's claim can attach. Under 11 U.S.C. § 506(a), Credibly of Arizona LLC's claim is therefore stripped of any secured status and is reclassified as a Class 5 General Unsecured Claim. |
| Allowed Secured Amount | $0 |
| Allowed Unsecured Amount | Such amount as may be allowed under § 502, treated under Class 5 |
| Confirmation Basis | If Class 2 does not accept the Plan, confirmation is sought under § 1191(b) |

**Class 3 — Academy Bank (Claim #6 — Junior Lien, Stripped Under § 506(a))**

| **Field** | **Value** |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Priority of Lien | Junior — second in priority behind the SBA's first-priority blanket lien |
| Treatment | Because the value of the collateral ($400,000) is fully consumed by the SBA's first-priority secured claim, no collateral value remains to which Academy Bank's claim can attach. Under 11 U.S.C. § 506(a), Academy Bank's claim is stripped of any secured status and is reclassified as a Class 5 General Unsecured Claim. |
| Allowed Secured Amount | $0 |
| Allowed Unsecured Amount | $33,099.74 treated under Class 5 |
| Confirmation Basis | If Class 3 does not accept the Plan, confirmation is sought under § 1191(b) |

**Class 3 — Epic Advance (Claim #13 — Junior Lien, Stripped Under § 506(a))**

| **Field** | **Value** |
|---|---|

| | |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Priority of Lien | Junior — second in priority behind the SBA's first-priority blanket lien |
| Treatment | Because the value of the collateral ($400,000) is fully consumed by the SBA's first-priority secured claim, no collateral value remains to which Epic Advance's claim can attach. Under 11 U.S.C. § 506(a), Epic Advance's claim is stripped of any secured status and is reclassified as a Class 5 General Unsecured Claim. |
| Allowed Secured Amount | $0 |
| Allowed Unsecured Amount | $30,500[1] treated under Class 5 |
| Confirmation Basis | If Class 3 does not accept the Plan, confirmation is sought under § 1191(b) |

**Class 3 — Fundomate (Claim #14 — Junior Lien, Stripped Under § 506(a))**

| Field | Value |
|---|---|
| Insider? | No |
| Impairment | Impaired |
| Priority of Lien | Junior — second in priority behind the SBA's first-priority blanket lien |
| Treatment | Because the value of the collateral ($400,000) is fully consumed by the SBA's first-priority secured claim, no collateral value remains to which Fundomate's claim can attach. Under 11 U.S.C. § 506(a), Fundomate's claim is stripped of any secured status and is reclassified as a Class 5 General Unsecured Claim. |

[1] The original claim #13 for Epic Advance was for the amount of $50,500. The Debtor anticipates that Epic Advance will receive $20,000 from settlements with Plastek and Sound Transit, reducing the claim by $20,000.

| | |
|---|---|
| Allowed Secured Amount | $0 |
| Allowed Unsecured Amount | $133,384.26 treated under Class 5 |
| Confirmation Basis | If Class 3 does not accept the Plan, confirmation is sought under § 1191(b) |

**B. Class of Priority Unsecured Claims.**

Certain priority Claims referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code generally requires that each holder of such a Claim receive cash on the Effective Date equal to the allowed amount of the Claim. A class of such Claims may, however, vote to accept different treatment.

**Class 4 — Priority Wage Claim of Liv D'Aquino (§ 507(a)(4))**

| Field | Value |
|---|---|
| Impairment | Unimpaired |
| Claim Description | Priority unsecured wage claim of Liv D'Aquino pursuant to § 507(a)(4). Pursuant to written agreement between the Debtor and Ms. D'Aquino dated May 8, 2026, the amended priority claim totals $5,930.38, consisting of: (a) $4,792.64 in base wages within 180 days of the Petition Date; (b) $281.89 for eight (8) hours of work performed on February 28, 2026 (handover/transition); (c) $705.85 for accrued PTO payout (20 hours at $35.2925/hour); and (d) $150.00 February expense stipend (non-taxable reimbursement). Any balance of Ms. D'Aquino's total claim (originally $9,744.29) above the priority portion is treated as a Class 5 General Unsecured Claim. |
| Treatment | Paid in full in cash as part of the Debtor's missed-payroll catch-up off-cycle payroll run scheduled for August 2026. See the Court Budget Exhibit — Missed Payroll Schedule and Payment Plan filed separately in this case. |

**C. Class of General Unsecured Claims.**

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

**Class 5 — General Unsecured Claims**

Class 5 consists of all general unsecured claims, including without limitation:

**(i) Filed Claims (totaling $290,790.81):**

| Claim # | Creditor | Amount |
|---|---|---|
| Claim 1 | American Express | $7,915.66 |
| Claim 2 | American Express | $100,389.00 |
| Claim 3 | American Express | $8,502.00 |
| Claim 5 | Intuit Financing | $17,479.40 |
| Claim 7 | American Express | $19,961.12 |
| Claim 8 | Chase | $35,380.85 |
| Claim 9 | Pershing Ventures | $97,347.82 |
| Claim 10 | Liv D'Aquino (non-priority balance) | $3,814.96 |

**(ii) Scheduled Claims that did not file a Proof of Claim and amounts owed as noted in the Debtor's schedules ($30,221.14):**

**Bonnie Timms - $4,835**

**David Komar - $1,066**
**Dikesh Chokshi - $4166.66**
**Gian Colombo – $5119.83**
**Quickbooks Capital - $15,033.65**
**Scott Dannemiller (noted as unknown, and would be disputed)**

**(iii) Reclassified Claims from § 2.2(A) ($1,647,376.63):**

- The SBA's deficiency claim, if any (the portion of SBA's total claim in excess of $400,000); ($1,285,910.00)
- Smart Business's claim, stripped of secured status under § 506(a); $39,793
- Academy Bank's claim, stripped of secured status under § 506(a). $33,099.74
- Credibly of Arizona LLC's claim, stripped of secured status under § 506(a). $124,689.63
- Epic Advance's claim, stripped of secured status under § 506(a). $30,500 ($50,500 claim less $20,000 expected proceeds from settlements with Plastek and Sound Transit)
- Fundomate's claim, stripped of secured status under § 506(a). $133,384.26

**(iv) Claims arising from the rejection of executory contracts, if any.**
**n/a**

Treatment of Class 5:

| **Field** | **Value** |
| --- | --- |
| Impairment | Impaired |
| Monthly Payment | Pro-rata share of disposable income remaining after payment of (i) Administrative Expenses, (ii) Class 1 SBA Allowed Secured Claim, and (iii) Priority Tax Claims under § 2.1(B) |
| Payments Begin | Yearly beginning with September 1, 2027 for the first calendar year of the plan. |
| Payments End | September 1, 2031. |
| Balloon Payment | None |
| Interest Rate | 0% per annum (claims paid at allowed amount without interest, consistent with § 1191©(2)) |
| Estimated Percent of Claim Paid | To be determined based on (a) final allowed claim amounts (which depend on resolution of the SBA total claim and IRS claim), (b) actual realized disposable income over the five-year Plan term, and (c) the True-Up Provision. The liquidation alternative under Chapter 7 would yield 0% to general unsecured creditors (see Liquidation Analysis, **Exhibit F**). Any distribution under this Plan represents an improvement over the Chapter 7 alternative. |
| True-Up Provision | If actual disposable income in any year of the Plan exceeds projections, excess disposable income above a reasonable operating reserve (defined as ninety (90) days of operating expenses) shall be applied to Class 5 distributions on or before March 31 of the following calendar year |
| Discharge | Upon completion of all Plan payments, the Debtor shall receive a discharge of Class 5 Claims consistent with § 1192 of the Code |
| Confirmation Basis | If Class 5 does not accept the Plan, confirmation is sought under § 1191(b) |

**D. Class of Equity Interest Holders.**

Equity Interest holders are parties who hold an ownership interest in the Debtor. In a corporation, entities holding preferred or common stock are Equity Interest holders. The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

**Class 6 — Equity Interest Holders**

| Field | Value |
|---|---|
| Holder | All holders of equity interests in the Debtor, including (a) holders of Class A Common Stock, (b) holders of unconverted Simple Agreements for Future Equity (SAFEs), and (c) record holders of equity issued in connection with the Debtor's Regulation Crowdfunding (Reg CF) offering. See Exhibit G (Capitalization Table). Bonnie K. Timms (f/k/a Bonnie K. Hagemann) is the largest single equity holder. |
| Impairment | Unimpaired |
| Treatment | All Class 6 equity holders retain their respective interests in the Reorganized Debtor without modification. Holders of Class A Common Stock retain their shares with all rights under the Amended and Restated Shareholder Agreement. Holders of unconverted SAFEs retain all conversion and economic rights under their respective SAFE agreements, which the Reorganized Debtor shall honor in accordance with their original terms upon any future triggering event. Record holders of Reg CF equity retain their interests. Class 6 is unimpaired and Class 6 holders will not receive ballots to vote on this Plan. |

**2.3 Estimated Number and Amount of Claims Objections.**

The Debtor may object to the amount or validity of any Claim within sixty (60) days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

| Class | Number of Claims Objected To | Amount of Claims Objected To |
|---|---|---|
| Class 2 (Smart Business) | 1 (potential objection to secured status and validity) | Smart Business Claim #4 — amount to be determined |
| Class 3 (Academy Bank) | 1 (objection to secured status only — Plan treatment strips lien) | Academy Bank Claim #6 — secured portion only |
| Class 2 (Credibly of Arizona LLC) | 1 (potential objection to secured status and validity) | Credibly of Arizona LLC Claim #12 – secured portion only |
| Class 3 (Epic Advance) | 1 (potential objection to secured status and validity) | Epic Advance Claim #13 – secured portion only |

| | | |
|---|---|---|
| Class 3 (Fundomate) | 1 (potential objection to secured status and validity) | Fundomate Claim #14 – secured portion only |

**2.4 Treatment of Executory Contracts and Unexpired Leases.**

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party. The Debtor has the right to reject, assume, or assume and assign these contracts, subject to Bankruptcy Court approval.

**[X] Assumption of Executory Contracts.**

The Executory Contracts shown on **Exhibit D** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Exhibit D also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases not expressly shown on Exhibit D, or not assumed before the date of the order confirming the Plan.

**Deadline for Filing Rejection Damages Claims:** Any Claim based on the rejection of an Executory Contract must be filed within thirty (30) days after entry of the Confirmation Order. Any such Claim will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.

**2.5 Means for Implementation of the Plan.**

The Plan will be funded entirely from the continuing operations of the Reorganized Debtor. The Debtor will continue to operate as a Missouri corporation under existing management with the following sources of funds and operating structure:

19. **Cash on Hand on the Effective Date.** The Debtor anticipates having sufficient cash on hand from accounts receivable collected during the case and ordinary-course operations to make all Effective Date payments. Tables showing the amount of cash on hand on the Effective Date and the sources of that cash are attached as **Exhibit E**.
20. **Operating Cash Flow During the Plan Term.** The Debtor's operations are supported by (a) projected services revenue for 2026 (reduced from prior estimates following the

Dannemiller / LifeWork termination described in § 1.8), (b) recurring technology subscription revenue from existing clients (LinkedIn Learning, John Mattone Partners, Alignmark, North American Risk Services, Citadel Solar and Roofing, NEIL, Centers for Independence), (c) the CEO's historical approximately $400,000 per year of direct sales contribution, and (d) growth of the technology subscription base supported by an active sales pipeline.

21. **Disposable Income Commitment.** Consistent with § 1191(c)(2), the Debtor commits all projected disposable income for the five-year Plan term to creditors under the Plan. The base Plan payment represents the floor; the Debtor commits to an annual True-Up of excess disposable income above operating reserves under § 2.2(C).
22. **Operating Structure.** The Reorganized Debtor will continue operating with two W-2 employees (the CEO and CTO) at materially reduced compensation per § 2.7, supplemented by 1099 contractors as required by client demand. This lean structure preserves cash flow for Plan payments.
23. **Plan Administration.** Plan payments shall be administered by the Debtor pursuant to § 1194(a) (if confirmed under § 1191(a) and after termination of the Trustee's service under § 1183(c)).

Subject to the Plan or the order confirming the Plan, on Confirmation all property of the Debtor, tangible and intangible, including, without limitation, licenses, intellectual property, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Debtor.

The Board of Directors of the Debtor immediately prior to the Effective Date shall serve as the initial Board of Directors of the Reorganized Debtor on and after the Effective Date. Each member of the Board of Directors shall serve in accordance with applicable non-bankruptcy law and the Debtor's articles of incorporation and bylaws, as each of the same may be amended from time to time.

### 2.6 Payments.

If the Plan is confirmed under § 1191(a), payments to Creditors provided for in the Plan will be made by the Debtor. Once the Trustee's service is terminated under § 1183(c), the Debtor shall make Plan payments except as otherwise provided in the Plan or in the order confirming the Plan.

If the Plan is confirmed under § 1191(b), except as otherwise provided in the Plan or in the order confirming the Plan, the Debtor shall make all Plan payments to creditors under the Plan.

### 2.7 Post-Confirmation Management.

The Post-Confirmation Officers/Managers of the Reorganized Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
| --- | --- | --- |
| Bonnie K. Timms | Chief Executive Officer | Annualized base salary, scaled to revenue:<br>• $0 (deferred) March–June 2026<br>• $60,000 ($5,000/mo) July–December 2026<br>• $75,000 ($6,250/mo) January–June 2027<br>• $100,000 ($8,333/mo) July–December 2027<br>• $125,000 ($10,416.67/mo) January–June 2028<br>• $150,000 ($12,500/mo) from July 2028 forward<br>Plus commission on direct sales pursuant to the Debtor's commission plan |
| Dikesh Chokshi | Chief Technology Officer | Annualized base salary, scaled to revenue:<br>• $60,000 ($5,000/mo) March–December 2026<br>• $75,000 ($6,250/mo) January–June 2027<br>• $100,000 ($8,333/mo) July–December 2027<br>• $125,000 ($10,416.67/mo) January–June 2028<br>• $150,000 ($12,500/mo) from July 2028 forward<br>Plus commission on tech sales pursuant to the Debtor's commission plan |

**2.8 Tax Consequences of the Plan.**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.*

The Debtor recommends each creditor consult a tax professional concerning any consequences of this Plan of Reorganization. The Debtor is responsible for seeking its own tax guidance concerning the impact of the reorganization. The Debtor will continue to operate as a Missouri corporation after Confirmation; no change in tax classification is contemplated.

**2.9 Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan.**

The Debtor has prepared a Monthly Budget and Projections covering the full 60-month Plan term from October 1, 2026 through September 1, 2031, attached as **Exhibit C**. Key assumptions include:

- Contracted base: projected services revenue of approximately $400,000 for 2026 (reduced from prior estimates following the Dannemiller / LifeWork termination described in § 1.8), plus signed multi-year technology subscription contracts (LinkedIn Learning at $3,200/month being the largest existing recurring contract);

- Historical CEO sales: The CEO's personally-originated revenue has averaged approximately $400,000 per year over the prior three years and is assumed to continue;
- Tech subscription growth: Technology revenue grows at roughly 16% per year, from $46,000 in Year 1 to $84,000 in Year 5, against TTM license revenue of $32,683
- Lean cost base: Two W-2 employees with the compensation ladder set out in § 2.7; 1099 contractors as workload requires; all non-essential overhead eliminated;
- Aggregate cumulative net income: After paying operating expenses, post-confirmation taxes, the compensation ladder set out in § 2.7, and the Plan payment, the revised budget projects cumulative net income of approximately break-even at the end of 2026 and approximately $67435 over the full 60-month Plan term ending September, 2031. The Plan’s base monthly payment is funded throughout, and excess disposable income above operating reserves is subject to the annual True-Up under § 2.2(C).

# ARTICLE 3

## FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 3.1 Ability to Initially Fund Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all Claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the Effective Date and the sources of that cash are attached as Exhibit E.

### 3.2 Ability to Make Future Plan Payments and Operate Without Further Reorganization.

The Debtor must submit all or such portion of the future earnings or other future income of the Debtor to the supervision and control of the Trustee as is necessary for the execution of the Plan. The Debtor has provided projected financial information in Exhibit C.

The Debtor’s financial projections show that the Debtor will have cumulative net income, after paying operating expenses, post-confirmation taxes, and the compensation ladder set out in § 2.7, of approximately break-even at the end of 2026 and approximately $67,435 of net profit over the full 60-month Plan term ending in September 2031. The final Plan payment is expected to be paid on or about September 1, 2031.

The growth model for the technology subscription revenue assumes Technology revenue grows at roughly 16% per year, from $46,000 in Year 1 to $84,000 in Year 5, against TTM license revenue of $32,683

*You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.*

# ARTICLE 4

## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. A Liquidation Analysis is attached as Exhibit F. The analysis demonstrates that general unsecured creditors would receive zero (0%) recovery in a Chapter 7 liquidation, such that any distribution under this Plan exceeds the Chapter 7 alternative and satisfies the best interest of creditors test under § 1129(a)(7).

# ARTICLE 5

## DISCHARGE

### 5.1 Discharge.

If the Plan is confirmed under § 1191(a), on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code.

If the Plan is confirmed under § 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan (and unless the court approves a written waiver of discharge executed by the Debtor after the order for relief), the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) and all other debts allowed under section 503 and provided for in this Plan, except any debt — (1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or (2) if applicable, of the kind specified in section 523(a).

# ARTICLE 6

## GENERAL PROVISIONS

### 6.1 Title to Assets.

If the Plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and general partners in the Debtor.

If the Plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided in § 1185, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the estate.

### 6.2 Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

### 6.3 Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4 Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases; and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

### 6.5 Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 6.6 Modification of Plan.

The Debtor may modify the Plan at any time before confirmation pursuant to § 1193(a). The Bankruptcy Court may impose additional requirements, including revoting on the Plan.

If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years as fixed by the court, and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.7 Final Decree.

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

# ARTICLE 7

## ATTACHMENTS

The following documents accompany the Plan:

- **[X]** Exhibit A — List of Debtor's Assets at Fair Market Value.
- **[X]** Exhibit B — Debtor's Liabilities.
- **[X]** Exhibit C — Financial Forecast for the Debtor (Monthly Budget and Projections, (October 2026 – September 2031).
- **[X]** Exhibit D — Summary of Executory Contracts and Unexpired Leases to be Assumed.
- **[X]** Exhibit E — Tables Showing Amount of Cash on Hand as of the Effective Date and Sources of That Cash.
- **[X]** Exhibit F — Liquidation Analysis.
- **[X]** Exhibit G — Business Valuation

# ARTICLE 8

## FREQUENTLY ASKED QUESTIONS

**What Is the Debtor Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. The Debtor here proposes a reorganization Plan that will allow it to continue operating its business and pay creditors over a five-year period from continuing operations.

**Why Am I Receiving This Plan?** To confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan. If creditors are satisfied with the information provided in the Plan and the terms as proposed and vote for the Plan, returning the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** First determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The pertinent section of the Plan dealing with that class will explain who is in that class, what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. § 2.2 of this Plan lists all classes of claimants and their types of claims.

**Why Is Confirmation Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm the Plan?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan under § 1191(b), but only if certain additional elements are shown, including that the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under and has not accepted the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion.

**How Do I Determine Whether I Am in an Impaired Class?** §§ 2.1 and 2.2 of the Plan identify the classes of creditors whose claims are impaired. Impaired classes under this Plan are Classes 1, 2, 3, and 5 (and the IRS Priority Tax Claim). Classes 4 and 6 are unimpaired.

**When Is the Ballot Deadline?** The deadline by which ballots must be returned will be set by the Court. Ballots should be mailed or emailed to:

Ryan A. Blay

WM Law

15095 W. 116th St.

Olathe, KS 66062

blay@wagonergroup.com

**How Do I Determine When and How Much I Will Be Paid?** § 2.2 of this Plan describes the treatment of each class of claims, including timing and amount.

# ARTICLE 9

## DEFINITIONS

9.1 The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only and are superseded by the definitions found in the Code.

9.2 Administrative Claimant: Any person entitled to payment of an Administration Expense.

9.3 Administrative Convenience Class: A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

9.4 Administrative Expense: Any cost or expense of administration of the Chapter 11 case entitled to priority under § 507(a)(2) and allowed under § 503(b), including without limitation any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

9.5 Administrative Tax Claim: Any tax incurred pursuant to § 503(b)(1)(B).

9.6 Allowed Claim: Any claim against the Debtor pursuant to § 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

9.7 Allowed Priority Tax Claim: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

9.8 Allowed Secured Claim: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate to the extent allowed as secured claims under § 506 of the Code.

9.9 Allowed Unsecured Claim: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

9.10 Bankruptcy Code or Code: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

9.11 Bankruptcy Court: The United States Bankruptcy Court for the Western District of Missouri.

9.12 Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure.

9.13 Cash: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

9.14 Chapter 11 Case: This case under chapter 11 of the Bankruptcy Code in which Executive Development Associates, Inc. is the Debtor-in-Possession.

9.15 Claim: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

9.16 Class: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

9.17 Confirmation: The entry by the Bankruptcy Court of an order confirming this Plan.

9.18 Confirmation Date: The date upon which the Bankruptcy Court shall enter the Confirmation Order; provided, however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

9.19 Confirmation Hearing: The hearing to be held on [DATE TO BE SET BY COURT] to consider confirmation of the Plan.

9.20 Confirmation Order: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

9.21 Creditor: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

9.22 Debtor and Debtor-in-Possession: Executive Development Associates, Inc., the debtor-in-possession in this Chapter 11 Case.

9.23 Disputed Claim: Any claim against the Debtor pursuant to § 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed.

9.24 Distributions: The property required by the Plan to be distributed to the holders of Allowed Claims.

9.25 Effective Date: The Effective Date of the Plan is 30 days after entry of the order confirming the Plan, unless the Confirmation Order provides otherwise.

9.26 Equity Interest: An ownership interest in the Debtor.

9.27 Executory Contracts: All unexpired leases and executory contracts as described in § 365 of the Bankruptcy Code.

9.28 Final Order: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

9.29 IRC: The Internal Revenue Code.

9.30 Petition Date: February 11, 2026, the date the chapter 11 petition for relief was filed.

9.31 Plan: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

9.32 Priority Tax Claim: Any Claim entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code.

9.33 Reorganized Debtor: The Debtor after the Effective Date.

9.34 Schedules: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

9.35 Secured Creditor: Any creditor that holds a Claim that is secured by property of the Debtor.

9.36 Trustee: G. Matthew Barberich, Jr., the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

9.37 True-Up Provision: The annual reconciliation described in § 2.2(C), pursuant to which excess disposable income above a 90-day operating reserve is distributed to Class 5 Allowed Unsecured Claims on or before March 31 of the following calendar year.

9.38 Unsecured Creditor: Any Creditor that holds a Claim in the Chapter 11 case that is not a secured Claim.

Respectfully submitted,

EXECUTIVE DEVELOPMENT ASSOCIATES, INC.

By: Bonnie K. Timms_

Bonnie K. Timms, President and Chief Executive Officer

/s/ Ryan A. Blay

Ryan A. Blay
State Bar No. KS-001066
WM Law
15095 W. 116th St.
Olathe, KS 66062
blay@wagonergroup.com
Telephone: (913) 422-0909
Counsel for Debtor

# EXHIBIT A

**List of Debtor's Assets at Fair Market Value**

*ATTACHED: A current schedule of Debtor's assets at fair market value, consistent with Schedule A/B filed in this case. To be prepared from the post-petition schedules.*

# EXHIBIT B

## Debtor's Liabilities

*ATTACHED: Current schedule of liabilities consistent with Schedules D and E/F filed in this case.*

# EXHIBIT C

**Financial Forecast — Monthly Budget and Projections**

October 1, 2026 – September 30, 2031

*ATTACHED: The Ongoing 2026 Contracts Budget for Court (Excel workbook) prepared by the Debtor, showing monthly income, expenses, and net cash flow over the 60-month projection period. Includes Monthly Budget, Commissions Detail, Sales Pipeline Projections, and Expenses Owed to Bonnie Timms.*

# EXHIBIT D

**Summary of Executory Contracts and Unexpired Leases to be Assumed**

The Debtor elects to assume the following Executory Contracts under § 2.4 of the Plan. Cure amounts are estimated to be zero ($0) for each contract unless otherwise noted, as the Debtor is current on all material obligations under each contract or has reached agreement with the counterparty:

| **Counterparty** | **Contract Description** | **Estimated Cure Amount** |
|---|---|---|
| LinkedIn Learning | Multi-year content licensing / services agreement ($3,200/month recurring) | $0 |
| John Mattone Partners | Technology subscription and services agreement (CultureVue/SurveyStreams) | $0 |
| Alignmark | Technology subscription and services agreement | $0 |
| North American Risk Services (NARS) | Technology subscription agreement | $0 |
| Citadel Solar and Roofing | Technology subscription agreement | $0 |
| Nuclear Electric Insurance Limited (NEIL) | Services agreement | $0 |
| Centers for Independence (CFI) | Technology subscription agreement | $0 |
| Honeywell KCNSC | Continuation of executive development services (FY27 continuation) | $0 |
| RAND Corporation | Change management / EQ engagement | $0 |
| Twin City Fan | Services engagement | $0 |
| Plastek | Services engagement (subject to receivable turnover) | $0 |

# EXHIBIT E

**Cash on Hand on the Effective Date**

Cash on hand on the Effective Date is estimated as follows:

| Item | Estimated Amount |
|---|---|
| Estimated Cash in the Debtor's bank account on the Effective Date | $15,000 |
| Additional cash Debtor will accumulate from net earnings between confirmation and Effective Date | $0 |
| Borrowing | $0 (none anticipated) |
| Capital contributions | $0 (none anticipated) |
| Other | $0 |
| TOTAL CASH ON HAND ON EFFECTIVE DATE | $15,000 |

Less amounts payable on the Effective Date:

| Item | Estimated Amount |
|---|---|
| Administrative Expenses payable on Effective Date (Clerk's Office fees and any approved professional fees) | $0 |
| Statutory costs and charges | $0 |
| Cure payments for executory contracts | $0 |
| Other Plan payments due on Effective Date | $0 |
| BALANCE AFTER EFFECTIVE DATE PAYMENTS | $15,000 |

# EXHIBIT F

## Liquidation Analysis

Pursuant to 11 U.S.C. § 1190(1)(B) and § 1129(a)(7)

**Methodology:** This Liquidation Analysis estimates the recoveries that the Debtor's creditors and equity interest holders would receive if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code, after an orderly wind-down and after payment of Chapter 7 trustee fees and expenses, secured creditors' allowed claims to the extent of collateral value, and priority claims. The analysis applies realistic fire-sale recovery factors to scheduled asset values, consistent with the actual market for the Debtor's assets (a services and SaaS business with limited tangible inventory or machinery).

Debtor's Estimated Liquidation Value of Assets:

| Asset Category | Scheduled / Book Value | Liquidation Recovery Factor | Estimated Liquidation Value |
|---|---|---|---|
| a. Cash on hand | $45,629.08 | 100% | $45,629.08 |
| b. Accounts receivable | $43,260.68 | 50% (Ch. 7 trustee collection limitations) | $21,630.34 |
| c. Inventory (assessment materials, training kits, books) | $5,000 (revised; original schedule overstated for services business) | 20% fire-sale | $1,000.00 |
| d. Office furniture & equipment | $16,373.51 | 20% fire-sale | $3,274.70 |
| e. Machinery & equipment (computers, laptops, servers; revised — original schedule overstated for SaaS business) | $25,000 | 30% fire-sale | $7,500.00 |
| f. Automobiles | $0 | — | $0 |
| g. Building & Land | $0 | — | $0 |
| h. Customer list (included with other intangibles below) | — | — | — |
| i. Investment property (stocks, bonds, financial assets) | $0 | — | $0 |
| j. Lawsuits or other claims against third parties (potential claims preserved under § 1.10) | Contingent; not monetized in liquidation | — | $0 |
| k. Other intangibles (registered trademarks, proprietary software code, customer relationships) | $126,240.20 (revised down from going-concern value to fire-sale value) | Direct estimate based on small-SaaS distressed asset sales | $125,000.00 |
| TOTAL ASSETS AT LIQUIDATION VALUE | | | $204,034.12 |

Deductions from Liquidation Value:

| Item | Amount |
| --- | --- |
| Total Assets at Liquidation Value | $204,034.12 |
| Less: Chapter 7 trustee fees and expenses (statutory under § 326, approximately 10% on first $5K, plus declining percentages; estimated) | $(15,200.00) |
| Less: Chapter 11 Administrative Expenses (estimated) | $(15,000.00) |
| Less: Priority claims, excluding Administrative Expense claims (Class 4 D'Aquino priority wage and any IRS priority claim) | $(5,930.38) |
| AVAILABLE FOR SECURED CREDITORS | $167,903.74 |
| Less: SBA First-Priority Secured Claim (capped at lesser of allowed amount and available collateral value under § 506(a)) | $(167,903.74) |
| AVAILABLE FOR ACADEMY BANK / SMART BUSINESS (junior liens) | $0 |
| Less: Debtor's claimed exemptions | N/A |
| (1) BALANCE AVAILABLE FOR UNSECURED CLAIMS | $0 |
| (2) Total dollar amount of unsecured claims (filed + scheduled + SBA deficiency + stripped junior liens) | $361,799.04+ (depending on SBA total claim and final reconciliation) |

**Percentage Recovery Under Chapter 7 Liquidation:**

- Secured Creditors (SBA only, junior liens recover nothing): partial recovery — approximately 42% of SBA's $400,000 secured cap (= $167,904 / $400,000), with the balance of SBA's total claim flowing into general unsecured;
- Junior Lien Secured (Smart Business, Academy Bank): 0% on secured portion;
- Priority Tax (IRS): subject to availability; estimated 0% in this analysis (because SBA's claim consumes available value after administrative claims);
- General Unsecured Creditors (Class 5): 0%.

**Percentage Recovery Under the Plan:**

- Class 1 SBA: 100% of $400,000 Allowed Secured Claim, paid with present-value interest;
- IRS Priority Tax: 100% of allowed claim over 5 years with 7% interest (subject to potential Offer in Compromise);
- Class 4 D'Aquino Priority Wage: 100% paid in cash;
- Class 5 General Unsecured: Greater than 0% (specific percentage depends on disposable income and final allowed claim amounts), exceeding the Chapter 7 alternative.

**Conclusion:** Each impaired Class receives at least as much under the Plan as it would receive under Chapter 7 liquidation. The Plan satisfies the best interest of creditors test under § 1129(a)(7).